**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| DAVID L. WALTERS ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:09-cv-01429-TWP-MJD |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of the Social Security ) | |
| Administration ) | |
| ) | |
| Defendant. ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff, David L. Walters ("Walters"), requests judicial review of the final decision of Defendant, Michael J. Astrue, Commissioner of the Social Security Administration (the "Commissioner"), who denied Walters' application for Supplemental Security Income ("*SSI*") under Title XVI of the Social Security Act. 42 U.S.C. § 1383(c). For the reasons set forth below, the Court **AFFIRMS** the decision of the Commissioner.

### I. BACKGROUND

On April 22, 2005, Walters filed an application for Disability Insurance Benefits and SSI alleging that he became disabled on April 7, 2003. (Tr. 64). Walters' application was denied on August 16, 2005, (Tr. 46) and upon reconsideration was denied again on January 3, 2006. (Tr. 40). On January 27, 2006, Walters made a request for a hearing by Administrative Law Judge ("ALJ"), (Tr. 39) and a hearing was held on January 4, 2008. (Tr. 698).

A.      **Walters' Work History**

Walters was born on February 5, 1959, and was 49 years old at the time of the ALJ's decision. (Tr. 20). Walters completed a twelfth grade education in approximately 1982.[1] (Tr. 130). From 1988 to 2000, Walters worked 40 hours a week as a carpenter. (Tr. 126). The record is void as to Walters' employment history from 2000 until 2004. Between 2004 and 2005, Walters worked briefly for Employment Plus, Inc., a temporary employment agency and worked for two days as a car wiper at a car wash. (Tr. 704-05). Additionally, in 2005, Walters worked for Beef Corporation of America[2] but was fired shortly after having allegedly inappropriate conduct with another employee.[3] (Tr. 705). From 2006 through 2007 Walters continued to work for different employers for short periods of time.

In 2006, Walters worked for Flambo as an assembly line handler but discontinued employment there because he was unable to keep up with the necessary pace. (Tr. 706). Also in 2006, Walters worked at NTN Drivershaft, where he operated machinery. (Tr. 707). Walters stated that after ninety days he did not get hired.[4] (Tr. 708). In 2007, Walters worked for less than a week each, in both the kitchen of Lenley's Catering and as a dishwasher at Sadie's Family Dining. (Tr.714-715). Each job ended due in part to Walters' inability to get along with his managers and co-workers.

---

[1] The ALJ in his decision indicated that Walters reported to his medical providers that he has a limited ninth grade education, although other parts of the record reflected that he completed twelfth grade. (Tr. 16).

[2] Walters cannot remember if his employment was with either Arby's or Burger King.

[3] The record indicates that Walters hugged a manager at work and was sent home that day. Three days later he was told that he was fired. (Tr. 705).

[4] Walters stated in the Social Security Administration's work background worksheet that he was fired because he failed a drug screen. (Tr. 646).

The last job Walters held was at McDonalds, where he worked from August of 2007 to November of 2007. (Tr. 646, 709). Walters discontinued employment at McDonalds again because of an inability to get along with his co-workers. (Tr. 646, 709).

**B.     Walters' Medical History**

Because Walters argues error exclusively in the ALJ's decision regarding his mental impairments and limitations, the Court will limit its recitation of Walters' medical history to evidence of such. In his SSI application, Walters alleged that his ability to work was limited due to bipolar disorder and pain in his left knee. (Tr. 125).

Walters' medical records reflect a history of mental impairments dating back to 2003. (Tr. 582-83, 618). On January 21, 2003, Walters was treated at Columbus Regional Hospital and was diagnosed with psychosis and a personality disorder with anti-social features. (Tr. 618). On February 17, 2003 Walters visited Quinco Behavioral Health Systems ("Quinco") and was treated by psychiatrist Susan Schneider M.D., for paranoia and other psychotic problems.[5] (Tr. 582-83). Nearly two years later, on December 8, 2004 and January 5, 2005, Walters was seen by Dr. Eriko Onishi of Volunteers In Medicine clinic. (Tr. 159-60). Although the visit was unrelated to his mental health, in his assessment, Dr. Onishi noted hallucinations and paranoid schizophrenia. (Tr. 159-60). On February 1, 2005, Walters saw Dr. Thomas Marshall, an orthopedic surgeon at Southern Indiana Orthopedics, for injuries to his right hand. (Tr. 595). Dr. Marshall indicated an impression of paranoid schizophrenia. (Tr. 595).

On May 7, 2005, Walters again returned to Quinco and began treatment for his emotional issues. (Tr. 588). During this visit Walters stated that the evaluation might help him get Medicaid and Social Security disability benefits. (Tr. 588). The Quinco notes indicated that

---

[5] The only evidence of this treatment appeared in notes made by Nurse Kell of Quinco on June 22, 2005. The record is void of any additional evidence of this particular treatment.

Walters displayed a great deal of psychosocial stressors. (Tr. 588). On June 10, 2005, Walters again visited Volunteers In Medicine clinic. This time Walters was seen by Joyce Briggs ("Briggs"), a Nurse Counselor.[6] (Tr. 154-55). Walters informed Briggs that he wanted to receive disability insurance. (Tr. 154). Walters further reported that his medication helped him and he was happy about his current job. However, Briggs noted that (1) Walters was irritable and quick-tempered *"if he believed people were doing things they should not do or were invading his space;"* (2) he sometimes thought that when people were laughing in a group setting, they were laughing at him; and (3) he had difficulty concentrating. (Tr. 155). Briggs' assessment was paranoid schizophrenia, and that they could *"possibly rule out bipolar disorder."* (Tr. 155).

On June 22, 2005, Walters again visited Quinco. This time he was seen by Susan Kell, M.S.N., RN.[7] (Tr. 582-583). Ms. Kell noted that Walters' paranoia had improved with medication, he did not describe any difficulties with hallucinations, and her impression was *"psychotic disorder, ruling out schizophrenia."* (Tr. 583). On July 1, 2005, Walters was again seen at Quinco and the counselor noted symptoms of paranoia. (Tr. 172).

**C.    State Mandated Evaluations**

On July 18, 2005, at the request of Social Security Administration ("SSA"), Walters was evaluated by a psychologist, Karl Evans, Psy.D. ("Evans"). (Tr. 609-612). Walters reported to Evans that he had *"a history of auditory hallucinations and paranoid ideation,"* and that he *"often believed that other people were terrorists."* (Tr. 609). Walters further stated that he experienced confusion, poor hygiene, odd behavior, inability to concentrate, spells of insomnia,

---

[6] On a tangential note, during this visit Walters' informed Ms. Briggs that for the last ten years he used the name of Barry Walters. (Tr. 154). Walters indicated that he had changed his name because of his sister's murder in Texas and his belief that the people who murdered her were also after him. (Tr. 154).

[7] As with Ms. Briggs, Walters informed Ms. Kell of using a different name in the past. (Tr. 582).

and suicidal ideation. Walters informed Evans that he functioned better when on medication, but he had taken himself off his medication in the past, which led to his psychotic symptoms. (Tr. 609-10). Finally, Walters indicated that while he experienced hallucinations even when he was not depressed, the frequency of the hallucinations increased when he was depressed.

Evans performed a mental status examination on Walters and concluded that Walters' cognitive abilities were intact, and his intelligence level was average; however. his immediate rote memory was low, which was likely related to Walters' poor concentration. (Tr. 610-11). Evans further noted that Walters' judgment was intact but atypical, which was likely related to his mental illness and life history. (Tr. 611). As to Walters' limitations from his mental disorders, Evans noted that his attention span was below average, but adequate and his stress tolerance was low. (Tr. 611-12).

Evans diagnosed Walters with Schizoaffective Disorder and noted that although his cognitive abilities were good, Walters had significant difficulties with paranoid thinking, poor social skills even while on medication, and had serious psychiatric problems. (Tr. 612). Evans rated the severity level of Walters' psychosocial stressors, such as social isolation, as moderate and found Walters' current Global Assessment of Functioning ("GAF") score to be 45 and his highest GAF score for the past year was 45.[8] (Tr. 612).

---

[8] *"The GAF scale is to be rated with respect only to psychological, social, and occupational functioning."* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision, 32 (2000). The rating reflects the individual's overall level of functioning. *Id*. The GAF range of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, etc.) or *"any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id*. at 34. The GAF range of 61-70 indicates some mild symptoms (e.g., depressed moos and mild insomnia or some difficulty in social, occupational, or school functioning, *"but generally functioning pretty well, has some meaningful interpersonal relationships."*

On August 15, 2005, a State Agency psychologist B.R. Horton, Psy.D. ("Horton") reviewed Walters' medical file. (Tr. 566). Horton opined that Walters had a mild limitation of the activities of daily living, and moderate limitations of social functioning and concentration, persistence, and pace. (Tr. 576).

On November 16, 2005, at the request of SSA, Walters underwent another psychiatric evaluation by a clinical psychologist Dr. Richard Karkut, Psy. D. ("Karkut"). (Tr. 555-59). Karkut noted that although Walters was diagnosed with a psychotic disorder in the past, his description of his use of the medication (Seroquel and Risperdal) indicated that they were functioning as antidepressants. (Tr. 559). Karkut's diagnosis was Major Depressive Disorder, Single Episode, with Psychotic Features, Mild, and Karkut found that Walters' current GAF score was 65 and his highest GAF score for the past year was 70. (Tr. 559).

On December 15, 2005, Walters met with Dr. Schneider who noted that Walters was stabilizing. (Tr. 142). Two months later, Nurse Kell, M.S.N., R.N., of Quinco, indicated in her notes that Walters reported increased depressive symptoms with some suicidal ideation but no intent. (Tr. 134). Quinco's records indicated that Walters had a GAF score of 61 during his treatment there and it remained stable from 2006 through 2007. (Tr. 648-69). On June 4, 2007, Nurse Kell's notes reflected that Walters was stable on his medication but by October 24, 2007 Nurse Kell noted that Walters' depression seemed to be worsening. (Tr. 670). The record indicates that this was the last visit Walters had before his January 4, 2008 hearing before the ALJ. (Tr. 641, 646A).

**D.    The Hearing**

At the hearing Walters was represented by counsel and asserted that his inability to work was due primarily to his emotional problems. (Tr. 702). Walters' counsel specifically provided

and referred to the reports prepared by Evans and Karkut and addressed the major differences in their reports. (Tr. 702). Walters testified at the hearing and recounted his work experiences, his living arrangements, his medical history, substance abuse history (Tr. 618-619) and his past criminal activity.[9] (Tr. 702-13).

Vocational expert ("VE") Gail Corn also testified at the hearing. (Tr. 721-29). The ALJ asked the VE if there were any jobs that could be performed by: 1) a person with Walters' age, education, and work experience; 2) who was limited to simple, repetitive tasks; 3) who should not be subject to strict high time or production quotas; 4) who should not have any contact with the general public and only occasional contact with co-workers; 5) who can lift, carry, push or pull 20 pounds occasionally or 10 pounds frequently; 6) who can occasionally perform postural activities, but should not crawl; and 7) who can occasionally climb ladders, scaffolds, or ropes and can occasionally climb trees. (Tr. 723). The VE testified that such jobs did exist and reported that a person with these limitations could do inspection jobs - and there were approximately 4,500 such jobs in the area and approximately 15,000 in the national economy. (Tr. 724). In addition, the VE testified that a person with Walters' credentials could perform work as a hand picker or packager and that there were approximately 5,000 such jobs in the State of Indiana and approximately 200,000 in the national economy. (Tr. 725).

The ALJ posed a final hypothetical question to the VE and inquired as to jobs in the competitive work economy that accounted for the already mentioned limitations, but that also accommodated a need to be isolated and reclusive. (Tr. 725-26). The VE testified that there were no such jobs and that, *"all work in the competitive work economy requires at least some minimal contact with coworkers and supervisors."* (Tr. 726).

---

[9] During his testimony, Walters admitted to the ALJ that in the past he used his dead brother's name and social security number. (Tr. 703-04).

The ALJ issued his denial decision on August 6, 2008. On August 14, 2009 Walters requested a review of the hearing decision, which was denied on September 22, 2009. Upon the Appeals Council's denial of the review, the ALJ's decision became the Commissioner's final decision. 20 C.F.R. § 404.981; *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994). Walters now requests review of the ALJ's decision pursuant to Title XVI of the Social Security Act, 42 U.S.C. § 1383(c).

## II. STANDARD OF REVIEW FOR DISABILITY DETERMINATIONS

To be eligible for disability insurance benefits, a claimant must establish a disability under 42 U.S.C. § 423. Disability is defined as an *"inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months."* 42 U.S.C. § 423(d)(1)(A).

In order to determine whether a claimant is disabled, the ALJ must evaluate the claim based on the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ must consider whether the claimant is engaged in a substantial gainful activity, and, if so, the claimant is not disabled. *Id*. Second, the ALJ considers the medical severity of the claimant's impairment, and if the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement set forth in 20 C.F.R. 404.1509, or a combination of impairments that meet the duration requirement, the claimant is not disabled. *Id*. In the third step of the analysis, the ALJ considers the medical severity of claimant's impairments, and if claimant has an impairment that meets or is equal to one of the impairments listed in the appendix of this section and meets the duration requirement, the claimant is disabled. *Id*. At step four, the ALJ considers the assessment of claimant's residual

functional capacity ("RFC") and his past relevant work, and if claimant is still able to do his past relevant work, claimant is not disabled. *Id*. During the last step of the evaluation process, the ALJ considers claimant's RFC assessment, age, education, and work experience to determine if claimant can make an adjustment to other work, and if the adjustment can be made, claimant is not disabled. *Id*. The burden of proof for steps one through four is on the claimant; however, the burden shifts to the Commissioner at step five. *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

The district court is vested with jurisdiction to review Commissioner's denial of benefits. 42 U.S.C. § 1383(c)(3). However, the court's standard of review on disability cases is limited. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citation and quotation marks omitted). The court must determine whether the final decision of the Commissioner is supported by substantial evidence and is based on the proper legal criteria. *Id*. (citation omitted). Substantial evidence is defined as *"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id*. (citations and quotation marks omitted). If Commissioner's findings are supported by substantial evidence, the ALJ's decision will be conclusive. *Id*.

While reviewing the record, the court must not attempt to substitute its judgment for the ALJ's "by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (quoting *Williams v. Apfel*, 179 F.3d 1066, 1071-72 (7th Cir. 1999)). The court will conduct a critical review of both the evidence that supports and detracts from Commissioner's final decision. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (citations omitted). In addition, the court will review whether the ALJ rationally articulated the grounds for his decision, and a remand may be required if the ALJ failed to "build an accurate and logical bridge from the evidence to

the conclusion." *Steele v. Barnhart*, 290 F. 3d 936, 941 (7th Cir. 2002) (citations and quotations omitted).

## III. <u>DISCUSSION</u>

### A. The ALJ's Finding

Pursuant to the Social Security regulations, the ALJ made the following findings as to Walters' claim. At step one, the ALJ found that Walters has not engaged is substantial gainful activity since the date of his SSI application, April 22, 2005. (Tr. 15). At step two, the ALJ determined that Walters *"has the following severe impairments: bilateral knee arthritis with residuals of a total knee replacement, arthritis of the hands with left wrist synovitis, bipolar disorder, and a history of polysubstance abuse."* (Tr. 15). At step three, the ALJ found that Walters' impairments or combination of impairments does not meet or medically equal a listed impairment. (Tr. 17). At step four, the ALJ made the following finding as to Walters' RFC determination:

> … [T]he claimant has the residual functional capacity to perform a range of light work, as defined in 20 CFR 416.967(b). … [H]e should lift, carry, push or pull no more than twenty pounds occasionally and ten pounds with frequency. He should stand, walk or sit no more than six hours each in an eight hour day. He is limited to occasional stooping, crouching, kneeling, balancing and climbing of stairs, ramps, ladders, scaffolds, or ropes. He should not crawl. In view of his mental impairments and side effects of medications, he is limited to work involving routine, repetitive tasks and understanding and carrying out of simple instructions. In view of reported problems with people and reclusive behavior, he should have no contact with the general public and only occasional superficial contact with co-workers. Because of reported reduced stress tolerance, he should not be required to meet strict high time or production quotas.

(Tr. 19).

At step four, the ALJ found that Walters was unable to perform his past relevant work. (Tr. 20). At step five, the ALJ denied Walters' claim because the ALJ found that there were a significant amount of jobs in the national economy that Walters could perform. (Tr. 21).

**B. Walters' Argument on Appeal**

Walters asserts a single error in this case. Walters argues that the ALJ's decision was based on the flawed RFC determination made between steps three and four. Walters argues that the RFC determination is erroneous because the ALJ failed to either accept or explain why he rejected the opinion of consulting examining psychologist Evans. Walters claims that the ALJ's finding is materially inconsistent with Evan's evaluation and warrants remand.

Social Security regulations impose a duty on the ALJ to consider the medical opinions in the claimant's case together with the remainder of the relevant evidence. 20 C.F.R. §§ 404.1527(b), 416.927(b). *Clifford v. Apfel*, 257 F.3d 863, 870 (7th Cir. 2000) (opinions of treating physicians are generally entitled to controlling weight). However, the ALJ is not required to provide written evaluation of every piece of evidence. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (citation omitted). If the ALJ articulates his reasons and builds a bridge between the evidence and the conclusion, the ALJ's duties are satisfied. *Id*. As noted above, if the Commissioner's final decision is supported by substantial evidence and is based on proper legal criteria, the ALJ's decision will be conclusive. *Scheck*, 357 F. 3d at 699.

The ALJ considered the records provided by Quinco, as to the classification of Walters' mental impairments; however, did not find Quinco's records *"very persuasive."* (Tr. 16-17). The ALJ found the records unpersuasive for two reasons. First, the ALJ pointed out that Walters did not begin counseling for his mental impairments at Quinco until shortly after he applied for disability benefits, which *"strongly suggested the possibility of secondary gain as a motive to begin counseling at that time."*[10] (Tr. 17). And second, the ALJ found not only that the Quinco

---

[10] The record is clear that during Walters' initial visit at Quinco on May 9, 2005, he indicated that the *"interview might help him get Medicaid and SSDI"*. (Tr. 588). On June 10, 2005, Nurse Counselor Joyce Briggs' noted that Walters *"wants to be disability and they do not even have a*

records primarily relied on self-reports made by Walters, but that they were *"entirely inconsistent with his demonstrated capabilities"* and that Walters was *"able to maintain work activities."* (Tr. 16, 18).

The ALJ's first conclusion is consistent with Seventh Circuit law. *See Dixon v. Massanari*, 270 F. 3d 1171, 1178 (7th Cir. 2001) (The ALJ may reject the opinion of a treating physician if it is based on claimant's exaggerated subjective allegations); *Ketelboeter v. Astrue*, 550 F. 3d. 620, 625 (7th Cir. 2008) (The ALJ may discount the opinion of a treating physician if it is *"based solely on the patient's subjective complaints."*); *Rice*, 384 F. 3d at 371 (The ALJ should rely on medical opinion based on objective observations and not on recitation of a claimant's subjective complaints).

The second issue presented by the ALJ poses a more critical analysis. The presented reasoning by the ALJ is contradicted by the ALJ's statement that *"the undersigned has accepted the claimant's argument that his work since his alleged onset of disability has consisted of unsuccessful work attempts"*[11] (Tr. 20). This presents the question of whether the ALJ considered Walters' employment history as ongoing work activity or unsuccessful work attempts. Ultimately, however, the Court finds substantial evidence as to the basis of the ALJ's

---

*record of him ever working or anything like that so he apparently now is trying to get the record straight but I think it is self serving at this point."* (Tr. 154).

[11] During the step one analysis in determining whether Walters engaged in substantial gainful activity since April 22, 2005, the ALJ addressed the issue of Walters' use of his dead brother's social security number in the past. The ALJ noted that SSA's record reflected considerable earned income under the brother's social security number, which exceeded substantial gainful activity for the years 2004 through 2007. Nevertheless, the ALJ accepted that the records do not reflect substantial gainful activity because Walters has had no opportunity to respond to this issue. However, in the ALJ's reasoning that Walters had the capacity to perform some type of work activity as well as an ability to function with people to at least a limited extent, the ALJ considered the combined earnings records under two Social Security numbers. The ALJ was not consistent in his reasoning to determine whether Walters was able to work or not.

determination that Quinco's records were less persuasive. Therefore, the fact that the ALJ was not consistent in determining whether Walters had ongoing work activity or unsuccessful work attempts is a harmless error. *Keys v. Barnhart*, 347 F. 3d 990, 994 (7th Cir. 2003) (doctrine of harmless error applies when it is plain that the factual error would not change the outcome of a case); *Sahara Coal Co. v. Office of Workers Comp. Programs*, 946 F.2d 554, 558 (7th Cir. 1991).

Walters argues that if the ALJ would have considered the GAF score determined by Evans, the finding that he is disabled would be appropriate. However, the GAF scale measurers a *"clinician's judgment of the individual's overall level of functioning."* Am. Psychiatric Ass'n, *supra* at 32. It is intended to be used for planning treatment and measuring its impact, and for predicting outcome. *Id.* Although Evans' GAF assessment of 45 is inconsistent with Karkut's score of 65 and Quinco's score of 61, *"nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score."* *Wilkins v. Barnhart*, 69 Fed. Appx. 775, 780 (7th Cir. 2003) (citing *Howard v. Comm' of Soc. Sec.*, 276 F. 3d 235, 241 (6th Cir. 2002) (GAF score could assist the ALJ in determining claimant's RFC, but it is not essential)). In addition, the *Wilkins* court upheld the ALJ's denial of disability benefits when the individual had a GAF score of 40. *Id.*

It is undisputed that the ALJ did not explicitly mention the consultative evaluation of Evans in his findings. However, as noted above, the ALJ is not required to provide a written evaluation for every piece of evidence. *Rice v. Barnhart*, 384 F.3d at 371. Here, the ALJ noted in the decision the existence of various diagnoses within the consultative medical record, considered the findings of the State agency's consultative reports, and gave them greater weight regarding the severity of Walters' mental impairments. (Tr. 17). The ALJ agreed with the

13

findings of the State agency that Walters' mental disorder imposed a *"mild limitation of the activities of daily living but moderate limitations of social functioning and concentration, persistence, and pace."* (Tr. 17). The ALJ's assessment was based on substantial evidence of the State Agency's findings prepared by Horton after he reviewed Walters' medical records on August 15, 2005.

Even if the ALJ committed error in failing to explicitly reject a medical assessment, the error is harmless because the fundamental question is whether the ALJ's decision is supported by substantial evidence. *Dykes ex rel. Brymer v. Barnhart*, 112 Fed. Appx. 463, 468 (6th Cir. 2004). Here, the ALJ relied on Dr. Horton's report as to severity of Walters' limitations because he did not find Quinco's records to be credible. As required, the ALJ discussed the evidence considered, explained the weight given to the evidence, and built an accurate bridge from the evidence to the final conclusion that Walters' mental impairments did not preclude him from retaining functional capacity to perform a significant number of jobs.

## IV. CONCLUSION

For the foregoing reasons, the final decision of the Commissioner is hereby **AFFIRMED**.

SO ORDERED.

Date: 03/17/2011

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Timothy J. Vrana
tim@timvrana.com